Rodrigo MALLO, individually and on behalf of all others similarly situated, Plaintiff,

v.

THE PUBLIC HEALTH TRUST OF DADE COUNTY, FLORIDA, Defendant.

No. 99–0064–CIV.

United States District Court, S.D. Florida, Miami Division.

March 31, 2000.

Steven K. Hunter, Angones, Hunter & McClure, Angel Gimenez, Carillio, Gimenez & Carillo, Miami, FL, for Plaintiff.

Jack P. Hartog, Asst. County Atty., Jackson Memorial Hospital, Miami, FL, for Defendant.

## ORDER DENYING MOTION TO DISMISS

LENARD, District Judge.

**THIS CAUSE** is before the Court on the Motion to Dismiss, filed by Defendant

Public Health Trust of Dade County, Florida April 12, 1999. Plaintiff Rodrigo Mallo filed a Response April 26, 1999. Based on a review of the Motion, the Response, and the record, the Court finds as follows.

## I. Statement of Facts

### A. The Medicaid System

The instant dispute arises out of the statutorily created relationship among a Medicaid patient, the health care provider that treated him, the State agency that disbursed Medicaid funds to the health care provider, and the federal government. At the center of this dispute is the balance billing provision of the Medicaid Statute,[1] codified at 42 U.S.C. § 1396a(a)(25)(C) (West 1992). As a predicate to discussing the factual background of this case, the Court first describes the Medicaid system and the balance billing provision.

Under the Medicaid Statute, Congress agreed to appropriate Medicaid funds to the States, in exchange for which the States provide affordable medical care to the poor. State governments depend on public and private hospitals to provide the necessary medical care. After the health care provider informs the State that the provider has treated an indigent patient, the State agency authorized to disburse Medicaid funds determines whether such a patient qualifies for Medicaid assistance. The patient must meet two conditions in order to obtain Medicaid assistance. First, the patient's income and resources must be "insufficient to meet the costs of necessary medical services." 42 U.S.C.A. § 1396. Second, the patient must seek medically necessary services. *See id.* If the patient qualifies, the State agency determines the cost of care and then disburses Medicaid funds to the health care provider for the treatment of the Medicaid patient.

By statutory mandate, the State and federal government work together to ensure that the designated State agency reasonably assesses the cost of Medicaid care for each patient. *See* 42 U.S.C.A. §§ 1396a(a)(30) & 1396b(g)(1)(C). The Medicaid Statute provides that Congress will reduce federal funds for Medicaid assistance, unless the State demonstrates to the federal government that the State-assessed costs of care for Medicaid patients do not exceed what is "necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C.A. § 1396a(a)(30). *See* 42 U.S.C.A. § 1396b(g)(1)(C); *see also Blum v. Yaretsky,* 457 U.S. 991, 994 n. 3, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (explaining that Medicaid Statute requires State to provide periodic review of patient care in nursing homes).

Aimed to protect indigent patients, the Medicaid Statute's balance billing provision precludes health care providers from billing Medicaid patients more than the amount of State-disbursed Medicaid funds. *See* 42 U.S.C.A. § 1396a(a)(25)(C).[2] Therefore, for example, even if a hospital initially bills a Medicaid patient $25,000, once the patient qualifies for Medicaid, and

1. In 1965, Congress enacted the Medicaid Statute as part of Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 *et seq.* (West 1990 ed.).

2. Section 1396a(a)(25)(C) provides:
   that in the case of an individual who is entitled to medical assistance under the State plan with respect to a service for which a third party is liable for payment, the person furnishing the service may not seek to collect from the individual (or any financially responsible relative or representative of that individual) payment of an amount for that service (i) if the total of the amount of the liabilities of third parties for that service is at least equal to the amount payable for that service under the plan (disregarding section 1396o of this title), or (ii) in an amount which exceeds the lesser of (I) the amount which may be collected under section 1396o of this title, or (II) the amount by which the amount payable for that service under the plan (disregarding section 1396o of this title), exceeds the total of the amount of the liabilities of third parties for that service ....

the State agency disburses a lesser amount, the patient need only pay the lesser amount as his or her full share. Upon receipt of the patient's payment, the health care provider then reimburses the State. These reimbursements to the State maintain a healthy surplus of Medicaid monies.

## B. Summary of Events

Plaintiff, a Medicaid patient, has sued Defendant, the Public Health Trust of Dade County, for breaching its obligation under the balance billing provision of the Medicaid Statute, arising out of the following events, as alleged in the Amended Class Action Complaint.

On April 13, 1996, Plaintiff was filling his automobile tire when it exploded. The explosion seriously injured Plaintiff, and he was admitted to and treated at Jackson Memorial Hospital ("JMH"). Defendant operates JMH, which is an agency and instrumentality of Miami–Dade County, Florida. At the conclusion of Plaintiff's stay at JMH, the hospital billed Plaintiff $16,000.00 for the medical care he received at JMH. In addition to the $16,000.00 medical bill, JMH also notified Plaintiff that it was asserting a lien in the amount of $12,466.00 upon any recovery Plaintiff obtained from third parties. Recognizing Plaintiff's indigent status, JMH then sought Medicaid benefits from the Florida agency authorized to disburse Medicaid funds, the Agency for Health Care Administration. The State agency determined Plaintiff to be eligible for Medicaid assistance, assessed Plaintiff's medical expenses, and paid $3,774.48 in Medicaid benefits to JMH. JMH accepted the Medicaid payment and re-billed Plaintiff $3,774.48.

On or about September 18, 1996, Plaintiff settled a personal injury lawsuit against Garden Tires, the manufacturer of the exploded tire, and its insurance carrier, Aries Insurance Company, for the poli-cy limit of $50,000.00. From the proceeds of this settlement, Plaintiff paid JMH $3,774.48 for the Medicaid benefits paid on his behalf. JMH maintained its hospital lien on Plaintiff's settlement award, and Plaintiff ultimately paid Defendant an additional $10,000 in satisfaction of this lien.

## C. Procedural History

Plaintiff filed its amended class action complaint on March 26, 1999.[3] Plaintiff seeks a declaratory decree that Defendant shall "reimburse the representative parties and class members for all sums recovered by [Defendant] in excess of Medicaid benefits paid to [Defendant] for expenses incurred by the representative party and class members." (Am. Class Action Compl. at 5.) Plaintiff seeks this relief because Defendant's lien on the settlement award and the subsequent payment is allegedly in violation of the Medicaid Statute's balance billing provision. Plaintiff claims that the balance billing provision set forth in 42 U.S.C.A. § 1396a(a)(25)(C) precludes public providers, such as Defendant, from billing patients for the balance remaining on a medical bill above the amount provided by the State agency distributing federal Medicaid funds. The Medicaid Statute does not explicitly create a private right of action for Medicaid patients to sue providers acting in violation of § 1396a(a)(25)(C). However, Plaintiff bases his cause of action on 42 U.S.C.A. § 1983 (West 1992) to sue Defendant for violating his federal rights under the balance billing provision of the Medicaid Statute.

On April 13, 1999, Defendant filed a Motion to Dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendant argues that Plaintiff cannot use § 1983 to sue Defendant under the Medicaid Statute's balance billing provision. In the absence of an explicitly created right of action within a statute,

---

**3.** On September 7, 1999, Plaintiff filed a Motion to Certify Class Action, which is still pending before the Court.

Defendant maintains that a § 1983 claimant must satisfy the Supreme Court's requirements in *Wright v. City of Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), and *Wilder v. Virginia Hosp. Assoc.*, 496 U.S. 498, 508–09, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), in order to bring a § 1983 claim. Defendant further contends that Plaintiff cannot meet these requirements.

Plaintiff responded to Defendant's Motion to Dismiss April 26, 1999. Plaintiff concedes that the § 1396a(a)(25)(C) does not explicitly create a right of action. However, Plaintiff, who also asks the Court to apply the *Wright* and *Wilder* tests, maintains that Medicaid patients in Plaintiff's position possess a federal right under the balance billing provision of the Medicaid statute.

## II. Standard of Review

The Eleventh Circuit has clearly set out the standard of review for a Rule 12(b)(6) motion to dismiss for failure to state a cause of action upon which relief can be granted. *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir.), *cert. denied*, 525 U.S. 1000, 119 S.Ct. 509, 142 L.Ed.2d 422 (1998):

> "The standard of review for a motion to dismiss is the same for the appellate court as it was for the trial court." *Stephens v. Department of Health and Human Servs.*, 901 F.2d 1571, 1573 (11th Cir.1990). A motion to dismiss is only granted when the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

"On a motion to dismiss, the facts stated in appellant's complaint and all reasonable inferences therefrom are taken as true." *Stephens*, 901 F.2d at 1573 (citing *Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir.1988)).

## III. Analysis

The broad issue before the Court is whether § 1983 provides Medicaid recipients with a right to sue a health care provider that has allegedly violated § 1396a(a)(25)(C) of the Medicaid Statute, which is apparently a question of first impression for the Eleventh Circuit. As discussed below, courts have employed a two-step test to determine whether a cause of action exists under § 1983. In this case, the Court's attention focuses on the second step of this test: whether a violation of the Medicaid Statute's balance billing provision is a violation of a Medicaid patient's federal right.

### A. Section 1983's Two–Step Test

Section 1983 creates a right of action for injured parties against

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

Congress enacted § 1983 so that a private citizen could sue persons, acting under the color of state law, who have violated that citizen's federal rights. Section 1983 may be used to remedy "all forms of official violation of federally protected rights." *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 700–01, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Supreme Court has required a two-step inquiry in order to determine whether § 1983 is available to remedy a violation of federal law. This two-prong inquiry is a disjunctive test. Section 1983 defendants bear the burden to demonstrate the first step, and § 1983 plaintiffs bear the burden to demonstrate the second step. However, Plaintiff must prevail on both prongs in order to survive dismissal of a § 1983 claim.

### 1. Specific Evidence of Congressional Intent to Foreclose Private Enforcement

■ The Supreme Court detailed the initial step of this inquiry in *Wright,* 479 U.S. at 423, 107 S.Ct. 766. *Wright* allows claimants to bring § 1983 actions where the state actor being sued cannot demonstrate "by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Wright,* 479 U.S. at 423, 107 S.Ct. 766. Defendants bear the burden of demonstrating that Congress has expressly withdrawn the § 1983 remedy. *See Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) [hereinafter *Golden State Transit* ] (citing *Wright,* 479 U.S. at 423, 107 S.Ct. 766, and *Middlesex County Sewerage Auth. v. National Sea Clammers Assn.,* 453 U.S. 1, 21 n. 31, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)). Thus, Plaintiff will not prevail if Defendant meets this burden.

■ Congress' intent to foreclose a § 1983 remedy under a federal statute cannot rest solely on the statutory provision of administrative mechanisms enacted to protect the plaintiff's interests. *See Golden State Transit,* 493 U.S. at 106, 110 S.Ct. 444 (citing *Wright,* 479 U.S. at 425–28, 107 S.Ct. 766). In *Golden State Transit,* the Court ruled that an applicant petitioning for a taxicab franchise renewal could use § 1983 to enforce his rights under the National Labor Relations Act ("NLRA"), 29 U.S.C.A. § 15 *et seq.* (West 1992). *See Golden State Transit,* 493 U.S. at 104, 110 S.Ct. 444. The applicant in *Golden State Transit* employed § 1983 to sue the city of Los Angeles for conditioning the renewal of his franchise based upon the settlement of the labor dispute between the applicant and the city. *See id.* Despite the extensive array of enforcement mechanisms under the NLRA, inclusive of the National Labor Relations Board's exclusive jurisdiction to prevent unfair labor practices by employers and employees, the *Golden State Transit* Court allowed the applicant to bring its § 1983 action based on governmental interference with the applicant's rights under the NLRA. *See id.* at 106–12, 110 S.Ct. 444. "[T]he statutory framework must be such that '[a]llowing a plaintiff' to bring a § 1983 action 'would be inconsistent with Congress' carefully tailored scheme.' " *Id.* at 107, 110 S.Ct. 444 (quoting *Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)). The *Golden State Transit* Court found no such inconsistency.

In this case, the Court similarly finds nothing either within the language of § 1396a(a)(25)(C) specifically or within the Medicaid Statute generally that expressly indicates Congress' intent to foreclose enforcement of Plaintiff's § 1983 action. Defendant has therefore not met its burden under the first prong of the § 1983 test.

### 2. Violation of Federal Right, Not Merely Federal Law

■ The Supreme Court's second step of inquiry requires claimants seeking § 1983 relief to assert a violation of federal right, not merely of federal law. *See Golden State Transit Corp.,* 493 U.S. at 106, 110 S.Ct. 444. For instance, in *Golden State Transit Corp.,* the Court found the Supremacy Clause of the Constitution does not create rights enforceable under § 1983 because the Supremacy Clause does not function as a source of rights, but instead merely " 'secures' federal rights by according them priority whenever they come in conflict with state law." *Id.* at 107, 110 S.Ct. 444 (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 613, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)).

It is this second step of the Supreme Court's inquiry that demands this Court's attention *sub judice.* Defendant's collection of $10,000.00 in excess of the Medicaid payment violated § 1396a(a)(25)(C) does not, without more, provide Plaintiff with a § 1983 remedy. To state a claim under § 1983 upon which relief may be granted, Plaintiff must also show that Defendant's breach of § 1396a(a)(25)(C) violated Plain-

tiff's federal rights under this statutory provision. Apparently, neither the Supreme Court nor the Eleventh Circuit has reviewed the question of whether the balance billing provision of the Medicaid Statute creates federal rights enforceable under § 1983. The Court's analysis will therefore concentrate on whether Plaintiff is a third-party beneficiary of the balance billing provision, and if so, whether the balance billing provision of the Medicaid Statute creates a federal right that he may enforce under § 1983. The Court's examination of this question is divided into two sections: (a) an overview of cases finding implicitly created federal rights for third-party beneficiaries within the Social Security Act and the Medicaid Statute and (b) an application of the three-part test, established in *Wilder*, 496 U.S. at 509, 110 S.Ct. 2510 (establishing a three-part test to determine whether statutory provisions implicitly create federal right enforceable under § 1983).

### a. Overview of Cases Finding Federal Rights for Third–Party Beneficiaries Created within the Social Security Act and the Medicaid Statute

In a landmark case examining, albeit not explicitly, the third-party beneficiary rights of § 1983 claimants, the Supreme Court declared that the plaintiff could use § 1983 to remedy violations of his federal rights established by the Social Security Act. *See Maine v. Thiboutot*, 448 U.S. 1, 1–8, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The *Thiboutot* Court specifically held that parents eligible for Aid to Families with Dependent Children ("AFDC") benefits could use § 1983 to sue the State of Maine for depriving the family of those benefits entitled to it under 42 U.S.C.A. § 602(a)(7). *See id.* at 1–8, 100 S.Ct. 2502.

Prior to *Thiboutot*, the Court had not broadened § 1983's umbrage to remedy the deprivation of federal rights implicitly created under federal statutes. The *Thiboutot* holding therefore expanded the scope of § 1983 and "exponentially increas[ed] the prospect of third-party bene-

ficiary suits to enforce spending conditions" by declaring that the Social Security Act established federal rights enforceable under § 1983. David E. Engdahl, *The Spending Power*, 44 Duke L.J. 1, 104 (1994) (discussing *Thiboutot*, 448 U.S. at 1, 100 S.Ct. 2502). Under § 602(a)(7) of the Social Security Act, the federal government appropriates AFDC benefits to the States, in exchange for which the States promise to deliver these benefits to those families entitled to them. Entitled to AFDC benefits for their eight children, the Thiboutots were poised as third-party beneficiaries to the agreement between the State and federal governments. Though the *Thiboutot* court did not specifically mention § 1396a(a)(25)(C), this holding paved the way for third-party beneficiaries, such as Medicaid patients, to utilize § 1983 to enforce their federal rights under the Social Security Act.

In addition, the Eleventh Circuit has twice found § 1983 can be used to enforce federal rights existing within the Medicaid Statute. The Eleventh Circuit held that § 1983 is appropriate to enforce federal rights created by § 1396a(a)(8) of the Medicaid Statute, when state officials fail to furnish Medicaid assistance with "reasonable promptness." *Doe v. Chiles*, 136 F.3d 709, 710 (11th Cir.1998) (reviewing claim by plaintiffs who "had been waiting for 'over five years' for Medicaid services"). In *Chiles*, the court determined that "a state's receipt of federal Medicaid funds is expressly conditioned on its compliance with the provisions of section 1396a." *Id.* at 718. It therefore follows that the developmentally disabled individuals qualifying for Medicaid services, specifically "intermediate care facilities for the developmentally disabled," in *Chiles* were third-party beneficiaries of the State-federal government agreement, under the Medicaid plan. *Id.* at 710.

Another Eleventh Circuit case examined whether health care providers may employ § 1983 to sue the State for denying them Medicaid reimbursements entitled under

§ 1396a(a)(23) of the Medicaid Statute. *Silver v. Baggiano,* 804 F.2d 1211, 1216–17 (11th Cir.1986). However, without applying its holding to the providers in that case, the *Silver* court firmly concluded that Congress intended § 1396a(a)(23) to create a federal right, enforceable under § 1983, for Medicaid patients to sue the State. *See id.* at 1217. The *Silver* court continued, "[T]he Medicaid Statute as a whole was enacted for the benefit of the recipients." *Id.*[4]

Nevertheless, the Court does not focus on whether a statute confers a right generally, but rather on whether a single statutory provision confers a specific right. *See Blessing v. Freestone,* 520 U.S. 329, 342–43, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (ruling that Title IV–D of the Social Security Act did not grant individuals a federal right to compel "substantial compliance" by the State agency responsible for enforcement). In *Blessing,* five mothers, whose children were eligible to receive child support services from the State of Arizona, pursuant to Title IV–D of the Social Security Act, *as added,* 88 Stat. 2351, *and as amended,* 42 U.S.C.A. §§ 651–669b (West Supp.1997), attempted to use § 1983 to enforce the mothers' individual rights to have the State's child support services achieve "substantial compliance" with the requirements of Title IV–D. *See id.* at 332–33, 117 S.Ct. 1353. The district court, initially reviewing the case, dismissed it after finding "Congress had foreclosed private actions to enforce Title IV–D by authorizing the Secretary [of Health and Human Services] to audit and cut off funds to States with programs that do not substantially comply with Title IV–D's requirements." *Id.* at 338, 117 S.Ct. 1353. The Ninth Circuit, however, reversed the district court. *See id.* Employing the *Wilder* test, the Ninth Circuit

found "substantial compliance" was not ambiguous in light of Title IV–D's "highly detailed requirements" whose "implementing regulations adequately notified the State of the extent of its duties." *Id.* at 338–39, 117 S.Ct. 1353. In dissent, Judge Kleinfeld maintained that the plaintiffs' " 'substantial. compliance' standard does not 'unambiguously confer' enforceable rights on any individual" under Title IV–D. *Id.* at 339, 117 S.Ct. 1353 (quoting *Freestone v. Cowan,* 68 F.3d 1141, 1157 (9th Cir.1995) (Kleinfeld, J., dissenting)). The Supreme Court reversed.

The Court in *Blessing* found " 'substantial compliance' with Title IV–D was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right." *Blessing,* 520 U.S. at 343, 117 S.Ct. 1353. The *Blessing* Court first discussed three Supreme Court cases, in which the Court had limited its inquiry to whether enforceable federal rights emanated from "specific provisions" within a piece of federal legislation. *See id.* at 342–343, 117 S.Ct. 1353 (citing *Wright,* 479 U.S. at 430, 107 S.Ct. 766; *Suter v. Artist M.,* 503 U.S. 347, 352, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); *Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994)). Finding the Ninth Circuit "did not engage in such a methodical inquiry," the *Blessing* Court criticized the plaintiffs' and the Ninth Circuit's "blanket approach" to determining whether Title IV–D creates rights, as a proper application of the *Wilder* test, *see infra* at 15, revealed that "many other provisions of the multifaceted statutory scheme do not fit our traditional three criteria for identifying statutory rights." *Blessing,* 520 U.S. at 344, 117 S.Ct. 1353. The *Blessing* Court agreed with the district court that the "substantial compli-

---

4. In *Harris v. James,* 127 F.3d 993 (11th Cir. 1997), the Eleventh Circuit held that a regulation did not establish a right to transportation, which medicaid patients could privately enforce under § 1983. The *Harris* court required medicaid patients seeking private enforcement of a valid regulation under § 1983

to establish "Congressional intent" that breaching the regulation violates a federal right. *Id.* at 1008 n. 20. However, this requirement does not apply to Plaintiff here because he seeks enforcement of a statutory provision, not a regulation.

ance" standard, along with other provisions, is "designed only to guide the State in structuring its systemwide efforts at enforcing support obligations." *Id.* Thus, failure to meet that standard violates federal law, but does not violate a federal right.

Nevertheless, the *Blessing* Court did "not foreclose the possibility that some provisions of Title IV–D give rise to individual rights." *Id.* at 345, 117 S.Ct. 1353. The Court found that the "lower court did not separate out the particular rights it believed arise from the statutory scheme," and that "the complaint is less than clear in this regard." *Id.* The Court further determined "it is not at all apparent that [the plaintiffs] sought any relief more specific than a declaration that their 'rights' were being violated and an injunction forcing Arizona's child support agency to 'substantially comply' with all of the provisions of Title IV–D." *Id.* at 346, 117 S.Ct. 1353. Therefore, the *Blessing* Court remanded the case to the District Court

> to construe the complaint in the first instance, in order to determine exactly what rights, considered in their most concrete, specific form, [the plaintiffs] are asserting. Only by manageably breaking down the complaint into specific allegations can the District Court proceed to determine whether any specific claim asserts an individual federal right.

*Id.*

### b. The *Wilder* Test

In finding § 1396a(a)(8) of the Medicaid Statute created federal rights, enforceable under § 1983, the *Chiles* court employed a three-part test established by the Supreme Court in *Wilder*, 496 U.S. at 509, 110 S.Ct. 2510. Absent an explicitly created, privately enforceable statutory right, the Court must employ the following three principal factors ("the *Wilder* test") to determine whether a statutory provision creates such a right enforceable under § 1983: (1) whether the plaintiff is an intended beneficiary of the statute; (2) whether the plaintiff's asserted interests are not so vague and amorphous as to be beyond the competence of the judiciary to enforce; and (3) whether the statute imposes a binding obligation on "the States." *Blessing,* 520 U.S. at 340, 117 S.Ct. 1353 (1997) (citing *Wilder,* 496 U.S. at 509, 110 S.Ct. 2510). To establish this Court's jurisdiction by determining whether § 1396a(a)(25)(C) confers a federal right on Plaintiff, he must therefore satisfy the three prongs of "the *Wilder* test," as the Medicaid Statute's balance billing provision, § 1396a(a)(25)(C), does not explicitly create a federal right for patients to sue public providers. *See Wilder,* 496 U.S. at 508–09, 110 S.Ct. 2510. The Court shall hereafter examine each part of the *Wilder* test individually.

### 1. Plaintiff Is the Intended Beneficiary of the Statute.

In order to enforce his action under § 1983, Plaintiff must first demonstrate that Medicaid patients are the intended beneficiaries of § 1396a(a)(25)(C). The Court finds Plaintiff has satisfied this prong. The Court reaches this conclusion by finding (a) Congress intended that Medicaid patients are to benefit from the third-party beneficiary obligation § 1396a(a)(25)(C) establishes; and (b) Congress intended for Medicaid recipients, not health care providers, to benefit from windfalls.

### a. Congress Intended That Medicaid Patients Are to Benefit from the Third–Party Beneficiary Contractual Obligation § 1396a(a)(25)(C) Establishes.

The Court must determine whether the third-party beneficiary contractual obligation, which § 1396a(a)(25)(C) establishes, shows that Medicaid patients are the intended third-party beneficiaries of the balance billing provision.

The Court in *Thiboutot,* 448 U.S. at 1, 100 S.Ct. 2502, opened the door for third-party beneficiaries to use § 1983 to enforce their rights under the statutorily created contract. Prior to *Thiboutot,* such

legal action was a question of state law, unless a federal right of action could be inferred from a particular condition to the contract. *See, e.g., Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (deducing from language and legislative history of Title IX of 1972 Education Amendments that third-party beneficiary of Title IX had right under it to pursue private cause of action against universities). One legal scholar has criticized *Thiboutot's* expansion of § 1983 because in that case, "only the agreement—and not the statute—makes the terms obligatory on the funds recipient and thus 'secures' the contemplated third-party rights." Engdahl, *supra,* at 104. However, courts subsequent to the *Thiboutot* decision have continued to uphold the use of § 1983 to enforce rights within statutorily created third-party beneficiary obligations. *See, e.g., Wright,* 479 U.S. at 431–32, 107 S.Ct. 766; *Wilder,* 496 U.S. at 524, 110 S.Ct. 2510; *Chiles,* 136 F.3d at 718; *see also Rybicki v. Hartley,* 792 F.2d 260, 261 (1st Cir.1986) (Breyer, J.) (describing a similar contractual relationship in the Medicare context as "guaranteeing payment to the hospital—the quid for which the hospital's 'no additional payment' promise was in part the quo").

In *Wright,* the Court determined that tenants living in low-income housing projects owned by the city had a third-party beneficiary right, under the Brooke Amendment to the Housing Act of 1937, 42 U.S.C.A. § 1437(a), to sue the city for violating the rent ceiling imposed by the amendment. *See Wright,* 479 U.S. at 431–32, 107 S.Ct. 766. The Brooke Amendment imposed a ceiling on rents charged to low-income persons living in public housing projects in order for those projects to receive federal housing money. *See id.* at 420, 107 S.Ct. 766. The *Wright* court found that the tenants, who benefit as third parties from an agreement between the federal government and the recipients of federal housing money, may use § 1983 to enforce their right, under the Brooke Amendment, not to pay rent that exceeds the ceiling. *See id.* at 431–32, 107 S.Ct. 766.

In *Wilder,* the Court found health care providers had a third-party beneficiary right under the Boren Amendment to the Medicaid Statute to sue the State of Virginia for its adoption of Medicaid reimbursement rates that were allegedly unreasonable and inadequate. *See Wilder,* 496 U.S. at 524, 110 S.Ct. 2510. The Boren Amendment requires States, as a condition to receiving Medicaid funding, to submit a reimbursement scheme to the Department of Health and Human Services for approval. *See id.* at 501, 110 S.Ct. 2510. The *Wilder* Court recognized health care providers were the intended third-party beneficiaries of this reimbursement scheme. *See id.* at 510, 110 S.Ct. 2510. As such, the Court found health care providers could use § 1983 to enforce their third-party beneficiary right to reasonable and adequate reimbursement rates under the Boren Amendment.

However, the clearest explanation of the statutorily created third-party beneficiary obligation is detailed in Justice Scalia's opinion concurring with a unanimous Supreme Court holding that plaintiffs may only use § 1983 to enforce federal rights emanating from specific provisions of multifaceted, federal legislation. *See Blessing,* 520 U.S. at 349, 117 S.Ct. 1353 (Scalia, J., concurring) (describing third-party beneficiary contractual relationship within structure of Title IV–D of the Social Security Act). Explaining the third-party beneficiary contractual relationship in *Blessing,* Justice Scalia's concurring opinion expounded, "In contract law, when such an arrangement is made (A promises to pay B money, in exchange for which B promises to provide services to C), the person who receives the benefit of the exchange of promises between the two others (C) is called a third-party beneficiary." *Blessing,* 520 U.S. at 349, 117 S.Ct. 1353 (Scalia, J., concurring). C benefits from the agreement of two parties, A and B, in Justice Scalia's hypothetical. Justice Sca-

lia stated further, "I am not prepared without further consideration to reject the possibility that third-party beneficiary suits simply do not lie. I join the Court's opinion because, in ruling against respondents under the Wright/Wilder test, it leaves that possibility open." *Id.* at 350, 117 S.Ct. 1353 (remarking that *Wright,* 479 U.S. at 418, 107 S.Ct. 766, and *Wilder,* 496 U.S. at 498, 110 S.Ct. 2510, permitted third-party beneficiaries of federal-State contracts to sue under § 1983, though plaintiff did not raise the argument). In the case *sub judice,* Plaintiff benefits from the exchange of promises among three parties—the federal government, the State, and the health care provider.

The Court thus finds the structure of § 1396a(a)(25)(C) creates a third-party beneficiary contractual obligation on the part of the health care provider to collect from the Medicaid patient no more than the amount of the Medicaid payment. Capping the amount of money providers can collect, the balance billing provision's mandatory language creates the terms of a third-party beneficiary contract to protect the financial interests of indigent Medicaid patients. *See* 42 U.S.C. § 1396a(a)(25)(C). The Court finds Plaintiff, as a Medicaid recipient, is the intended, third-party beneficiary to the contract established by § 1396a(a)(25)(C), in which (a) the federal government promises Medicaid money to the State in exchange for which the State will provide medical care for the poor; (b) private and public health care providers have promised the State to provide medical care for indigent patients, in exchange for which the State will reimburse the provider with Medicaid funds; and (c) the State will disburse Medicaid funds at an amount it sets, in exchange for which the health care provider will not charge the

patient more than the amount of Medicaid funds that the provider receives from the State. Medicaid patients benefit from this contract by receiving immediate, quality medical attention, and paying a relatively affordable medical bill. Thus, as in *Rybicki,* guaranteeing payment to the hospital is the "quid" for which the hospital's no additional payment promise was in part the "quo." *Rybicki,* 792 F.2d at 262. Medicaid patients, such as Plaintiff, are therefore the provision's intended third-party beneficiaries.

### b. Congress Intended for Medicaid Recipients, Not Providers, to Benefit from Windfalls.

The Court now examines whether Congress intended to benefit Medicaid patients or health care providers in the event a Medicaid recipient settles with a third-party tortfeasor for an amount that exceeds the amount of the Medicaid disbursement for the patient's care. The Court finds Congress intended the Medicaid recipients to benefit from such a windfall.

Not only has Congress enacted the balance billing provision to the Medicaid Statute, but State legislators have also passed legislation limiting the amount of money health care providers may collect from Medicaid patients. For instance, under Florida law, a hospital accepts a Medicaid disbursement as payment in full for the treatment of a Medicaid patient. *See* Fla. Stat. ch. 409.907(3)(j) (1998);[5] *Public Health Trust v. Dade County Sch. Bd.,* 693 So.2d 562, 565 (Fla. 4th Dist.Ct.App.1997). In the case *sub judice,* these State and federal collection limits resulted in Plaintiff's windfall of $12,225.52, the difference between Plaintiff's original hospital bill of $16,000.00 and the $3,774.48 Medicaid pay-

---

**5.** Florida law requires health care providers to

> [a]ccept Medicaid payment as payment in full, and prohibit the provider from billing or collecting from the recipient or the recipient's responsible party any additional amount except, and only to the extent the agency permits or requires, copayments,

coinsurance, or deductibles to be paid by the recipient for the services or goods provided. The Medicaid payment-in-full policy does not apply to services or goods provided to a recipient if the services or goods are not covered by the Medicaid program.

Fla. Stat. ch. 409.907(3)(j).

ment. The state law's concurrent governance of this collection limit, however, does not eliminate the possibility that Congress intended Medicaid patients to benefit similarly from § 1396a(a)(25)(C).

The Seventh Circuit has held that Medicaid patients, while benefitting from Illinois law, were the intended beneficiaries of § 1396a(a)(25)(C). *See Evanston Hosp. v. Hauck,* 1 F.3d 540, 541–44 (7th Cir.1993), *cert. denied,* 510 U.S. 1091, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994). In a case factually similar to the instant matter, the *Hauck* court found that the balance billing provision of the Medicaid Statute echoed the governing Illinois law [6] by "directly contradicting" the health care provider's "assertion that States may not contribute Medicaid disbursements on the understanding that payments are full and final." *Id.* at 543–44.

In *Hauck,* a Medicaid patient amassed a $270,760.24 medical bill, and the hospital accepted $113,424.00 in Medicaid money from the administrating State agency. *See id.* at 542. The patient then won a $9.6 million judgment from a third-party tortfeasor, in a suit emanating from the patient's injury. *See id.* Upon learning of the patient's "newfound wealth," the hospital sought to free itself of its collection limit by returning its $113,424.00 Medicaid disbursement to the State. *Id.* The hospital hoped that once relieved of its obligation to the State, the hospital could sue the newly remunerated patient for the full

$270,760.24. *Id.* However, the *Hauck* court blocked the suit.[7] The Seventh Circuit held that a Medicaid patient's change of fortune does not provide a hospital with an excuse to break its obligation to the State, return its Medicaid disbursement, and proceed against the patient for an amount of money in excess of the Medicaid payment. *See id.* at 543. "At no point in the law governing Medicaid are states directed not to pay for services where the patient is or may be entitled to payments by a third party." *Id.*

Further, other courts have held that the balance billing prohibition has precluded providers, which had already accepted Medicaid and Medicare payments on a patient's behalf, from suing such a patient for sums she later recovered in a settlement or personal injury lawsuit with the tortfeasor. *See, e.g., Rybicki,* 792 F.2d at 260 (Breyer, J.) (precluding hospital from collecting patient's third-party settlement proceeds in excess of Medicare disbursement);[8] *Palumbo v. Myers,* 149 Cal. App.3d 1020, 197 Cal.Rptr. 214 (Cal. App.3d 1983) (blocking physician's recovery, in excess of Medi–Cal payment, from settlement in patient's third-party tort action); *Public Health Trust,* 693 So.2d. at 562 (ruling that provider cannot recover "third-party benefits" in excess of the amount of medical assistance paid by Medicaid). The Medicaid system rests on the State agency's capacity to maintain a healthy Medicaid surplus. The balance

---

6. The Illinois law discussed in *Hauck* mirrors Florida Statute chapter 409.907(3)(j).

   Under Illinois law, when Medicaid pays money to a hospital on behalf of an individual, it "shall constitute payment in full for the goods or services covered thereby...." 305 ILCS 5/11–13.... "The provider [hospital] shall agree to ... [A]ccept (sic) as payment in full the amounts established by [the State agency]...." Ill. Admin. Code tit. 89, § 140.12(h) (1993). *Hauck,* 1 F.3d at 542.

7. At the time Evanston Hospital sued Hauck, the hospital had yet to either return the Medicaid disbursement to the State or collect the excess money from the patient. *See id.* at 542. By contrast, Defendant here has already

collected on a $10,000.00 lien in addition to the $3,777.00 Medicaid reimbursement. This factual distinction only highlights the ripe nature of Plaintiff's case and the gravity of his injury here.

8. The *Rybicki* court interpreted a provision of the Medicare statute, similar in effect to the balance billing provision of the Medicaid Statute, to bar a hospital from charging a Medicare recipient more than the $9,000.00 which the hospital received from Medicare for the treatment of the Medicare recipient, after the Medicare recipient recovered $100,000.00 in a settlement with the tortfeasor. *See Rybicki,* 792 F.2d at 261 (analyzing 42 U.S.C. § 1395cc(a)(1)(A)).

billing provision supports this goal by forcing providers to make a calculated choice whether to apply for Medicaid assistance. Once a health care provider commits to Medicaid assistance for a patient, the provider is barred from billing the patient for an amount in excess of the State's Medicaid disbursement.[9] By contrast, should the health care provider elect not to apply for Medicaid assistance, then the provider can charge the market value of the treatment.

Once the State agrees to disburse Medicaid funds to the health care provider, the provider's sole remaining responsibility is to collect the patient's reimbursement for the Medicaid assistance. The State, however, may "vigorously" seek reimbursement from any third party "who might bear some legal responsibility for footing the bill." *Hauck*, 1 F.3d at 543. As such, the *Hauck* court found that Congress intended for "state Medicaid agencies, *not* hospitals and doctors," to seek reimbursement from third party tortfeasors. *Id.* (emphasis added). If health care providers were allowed to collect from third-party tortfeasors, in excess of the Medicaid disbursement, providers would tap the State's Medicaid surplus dry by requesting Medicaid assistance for each patient. As

the Seventh Circuit noted, health care providers "would have every incentive to capture as much government money as they could" without being certain that private parties (*e.g.*, third-party tortfeasors) would reimburse the provider and the Medicaid system. *Id.* at 544. "Medicaid would go bankrupt" if the system created an "insurance program for hospitals rather than for indigent patients." *Id.* at 544.[10] Since the hospital's initial bill exceeds the Medicaid payment, a windfall is inevitable. But, "someone was bound to receive a windfall in these circumstances, and Congress decided it should be the recipient of medical care, not the hospital." *Hauck*, 1 F.3d at 544. Since Medicaid patients are the intended beneficiaries of such a windfall, health care providers are not entitled to prey on an otherwise poor patient's change in economic status. Plaintiff, a Medicaid recipient, is therefore the intended beneficiary of § 1396a(a)(25)(C) and meets the first prong of the *Wilder* test.

### 2. Plaintiff's Asserted Interests Are within the Competence of the Judiciary to Enforce.

To satisfy the second factor of the *Wilder* test, Plaintiff's asserted interests can-

---

**9.** The State agency disbursing Medicaid funds—not the provider—determines the reasonable cost of the medical care provided. *See* Jane Reister Conard, *Granny Dumping: The Hospital's Duty of Care to Patients Who Have Nowhere to Go*, 10 Yale L. & Pol'y Rev. 463, 471, 477 (1992) (describing the legal and economic landscape pushing private providers "to 'dump' unstable, indigent patients on to public facilities"). Understanding that they would not be able to provide proper medical care to the poor without this State involvement, providers "shift" these costs. John V. Jacobi, *Mission and Markets in Health Care: Protecting Essential Community Providers for the Poor*, 75 Wash. U.L.Q. 1431, 1459 (1997) (explaining that "cost-shifting for the benefit of the uninsured poor is an appropriate statutory goal of a Medicaid program."). Providers certainly make financial sacrifices to care responsibly for the uninsured poor; yet, without Medicaid, providers could not afford to do so. *See* Jennifer Steinhauer, *Hospitals Agency Gird Itself for Challenges of Medicaid Managed Care*, N.Y. Times, December 8, 1998; Tamar Lewin, *Hospitals Serving the Poor Struggle to*

*Retain Patients*, N.Y. Times, Sept. 3, 1997, at Al.

**10.** The Court recognizes that hospitals are frequently without funding mechanisms to pay for unreimbursed medical care, which COBRA mandates these hospitals provide in certain circumstances. *See* 42 U.S.C.A. § 1395dd (West Supp.1997) (requiring patients to be stabilized so that "within reasonable medical probability," the patient's condition will not materially deteriorate). This burden of providing unreimbursed care has indeed compelled hospitals "to reduce services, close their emergency departments, or close their doors altogether." Conrad, *supra*, at 477. However, Plaintiff's care was reimbursed. The State's Medicaid disbursement made Defendant whole for the reasonable cost of the care provided. In addition, Plaintiff reimbursed the State and the hospital for the Medicaid assistance he received. Even still, judicial restraint demands that this Court not manipulate Congress' intent under § 1396a(a)(25)(C) to correct the iniquities to which § 1395dd(f) has contributed.

not be "so vague and amorphous as to be beyond the competence of the judiciary to enforce." *Blessing,* 520 U.S. at 329–30, 117 S.Ct. 1353 (citing *Wilder,* 496 U.S. at 509, 110 S.Ct. 2510). The Court finds they are not.

The Medicaid Statute mandates the "assignment of rights of payment for medical support and other medical care *owed* to recipients." 42 U.S.C.A. § 1396a(a)(45) (West.Supp.1997) (emphasis added). Once the State pays the provider, that State Medicaid payment becomes the full payment, and both the federal balance billing provision and Florida law preclude the provider from collecting any other funds from the recipient. *See* § 1396a(a)(25)(C); Fla. Stat. ch. 409.907(3)(j); *Public Health Trust,* 693 So.2d at 565; *cf. Rybicki,* 792 F.2d at 263 (finding the same under Medicare). Therefore, as alleged in the Amended Class Action Complaint, the Medicaid statute obligated Plaintiff to assign rights of payment in the amount of $3,774.48, which Plaintiff reimbursed to the State. Any award Plaintiff receives from a settlement or lawsuit in excess of the Medicaid payment is his rightful windfall. *See Hauck,* 1 F.3d at 544.

Several courts have enforced the interests of Medicaid patients emanating from violations of the Medicaid Statute's balance billing provision. *See, e.g., Bower v. Buckeye Village Market Employee Benefit Plan,* 182 F.3d 916, 1999 WL 397962, *1 (6th Cir. June 4, 1999); *Hauck,* 1 F.3d at 540; *Rybicki,* 792 F.2d at 260 (Breyer, J.); *Palumbo,* 149 Cal.App.3d at 1020, 197 Cal.

Rptr. 214; *Public Health Trust,* 693 So.2d. at 562.[11]

In *Bower,* 1999 WL 397962 at *1, the Sixth Circuit affirmed the lower court's decision that the Ohio Department of Human Services had derivative standing, on behalf of an employee who could qualify for Medicaid, to sue that employee's employer to recover medical expenses. In addition, the *Bower* court did not disagree with the lower court's finding that the employee "himself could, in theory, raise claims for additional payments from the plan in excess of those paid through the Medicaid program." *Id.*

The Court, therefore, finds Plaintiff's asserted interest in recovering his money paid in excess of the Medicaid reimbursement is well within the competency of the judiciary to enforce. Plaintiff therefore meets the second prong of the *Wilder* test.

### 3. The Balance Billing Provision of the Medicaid Statute Imposes a Binding Obligation on a Governmental Unit.

The balance billing provision of the Medicaid Statute must impose a binding obligation on a governmental unit in order for Plaintiff to meet prong-three of the *Wilder* test. Plaintiff must therefore show (a) a statutorily imposed binding obligation on the health care provider and (b) that the health care provider is a governmental unit.

---

11. *But see State Agency for Health Care Admin. v. Estabrook,* 711 So.2d 161, 163 (Fla. App. 4th Dist. 1998). The *Estabrook* court found that the State agency administrating Medicaid funds could enforce a lien on a patient and collect a third-party settlement award that exceeded the Medicaid payment made on the patient's behalf. *See id.* The *Estabrook* court arrived at this holding because Medicaid applicants must "assign to the state whatever rights [they] may have to payment for medical care." *Id.* (citing 42 U.S.C. § 1396k(a)(1)(A)). However, in *Estabrook,* the settlement awarded "Estabrook $475,000.00, but expressly provide[d] that most of this sum represent[ed] 'attendant care

benefits,' and that none of it represents past or future medical benefits or expenses." *Estabrook,* 711 So.2d at 163. Consequently, Estabrook did not even reimburse the State for the Medicaid disbursement prior to the State's assertion of the lien. *See id.* Here, however, Plaintiff fully reimbursed Defendant and the State for the $3,774.48 Medicaid payment. As such, the State has no reason to assert a lien on Plaintiff. Rather, Defendant, the health care provider, has asserted a lien for money in excess of the Medicaid payment. The *Estabrook* decision is therefore distinguishable from the case here on its facts and does not preclude Plaintiff from bringing the instant action by himself.

### a. Section 1396a(a)(25)(C) Imposes a Binding Obligation on Defendant.

The Court first analyzes whether § 1396a(a)(25)(C) imposes a binding obligation on Defendant.

██ In order for the Court to find a federal right within a statutory provision, the provision's language must be mandatory, not merely a " 'congressional preference' for a certain kind of conduct." *Wilder*, 496 U.S. at 510–11, 110 S.Ct. 2510 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). In *Chiles*, 136 F.3d at 718, the Eleventh Circuit found that the language of § 1396a(a)(8) of the Medicaid Statute is "undoubtedly cast in mandatory rather than precatory terms." Section 1396a(a)(8) states, "the person furnishing the service *may not* seek to collect from the individual (or any financially responsible relative or representative of that individual) payment of an amount for that service." 42 U.S.C.A. § 1396a(a)(8) (1968) (emphasis added). The pertinent language of the Medicaid Statute's balance billing provision mirrors the key language of § 1396a(a)(8), as § 1396a(a)(25)(C) mandates, "the person furnishing the service *may not* seek to collect from the individual(or any financially responsible relative or representative of that individual) payment of an amount for that service" in excess of the State's disbursement of Medicaid funds for the treatment of that individual. § 1396a(a)(25)(C) (emphasis added). By comparison, therefore, the verbiage of § 1396a(a)(25)(C) clearly imposes a binding obligation on the health care provider.

### b. Defendant Is a Governmental Unit and Can Be Sued under Section 1983

The Court now examines whether the Medicaid Statute's balance billing provision imposes a binding obligation on a governmental unit, and whether Defendant is such a governmental unit.

The third prong of the *Wilder* test is based on the rationale established in *Pennhurst*, 451 U.S. at 19, 101 S.Ct. 1531. *See*

*Wilder*, 496 U.S. at 509, 110 S.Ct. 2510. The *Pennhurst* Court found the "bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 89 Stat. 486, *as amended*, 42 U.S.C.A. § 6010 (West Supp. III 1976 ed.), did not create any substantive rights because the provision merely expressed Congress' preference and not its mandate. *See Pennhurst*, 451 U.S. at 19, 101 S.Ct. 1531. Defending its conclusion, the *Pennhurst* Court discussed the respondent's argument that "the legislative history of the bill as passed by the Senate evinces Congress' intent to impose absolute obligations on the States to fund certain levels of treatment." *Id.* at 20, 101 S.Ct. 1531. Rejecting this argument, the Court pointed to statements made by senators and congressmen alike that the aim of the provision was to "stimulate" and "assist" the "States," but not to obligate them. *Id.* at 21–23, 101 S.Ct. 1531.

In *Wilder*, 496 U.S. at 509, 110 S.Ct. 2510, however, the Court substituted the broader term, "governmental unit," for "States." The "governmental unit" to which the *Wilder* Court referred was the Virginia Hospital Association, a nonprofit corporation composed of both public and private hospitals operating in Virginia. *Id.* at 503, 110 S.Ct. 2510. Other courts have also adopted the term, "governmental unit," where the defendant being sued under § 1983 is not the State itself, but is nevertheless an instrumentality of the State. *See, e.g., Livadas,* 512 U.S. at 132, 114 S.Ct. 2068 (employing "governmental unit" in § 1983 action against Commissioner of California Division of Labor Standards Enforcement) (citing *Pennhurst,* 451 U.S. at 27, 101 S.Ct. 1531); *Rodriguez v. DeBuono,* 175 F.3d 227, 233 (2d Cir.1999) (adopting "governmental unit" in § 1983 action against commissioners from New York State and County Departments of Health); *Alsbrook v. City of Maumelle, Ark.,* 156 F.3d 825, 832 (8th Cir.1998) (using "governmental unit" in § 1983 action against City of Maumelle, Arkansas, State of Arkansas, Arkansas Commission on law

Enforcement Standards & Training, and its Commissioners), *rev'd on rehr'g on other grounds,* 184 F.3d 999 (8th Cir.1999); *Aristil v. Housing Auth. of the City of Tampa,* 54 F.Supp.2d 1289, 1293 (M.D.Fla. 1999) (utilizing "governmental unit" in § 1983 action against the Housing Authority of the City of Tampa); *Rolland v. Cellucci,* 52 F.Supp.2d 231, 234 (D.Mass.1999) (adopting "governmental unit" when defendants being sued under § 1983 include the governor and the secretaries and commissioners of several state agencies); *Moody Emergency Med. Serv. v. City of Millbrook,* 967 F.Supp. 488, 492 (M.D.Ala.1997) (using "governmental unit" in § 1983 action filed against City of Millbrook, Alabama); *but see Blessing,* 520 U.S. at 340, 117 S.Ct. 1353 (employing "States" in § 1983 action against director of Arizona's child support agency); *Chiles,* 136 F.3d at 713 & 718 (adopting both "governmental unit" and "the States" in § 1983 action against Florida Department of Health and Rehabilitative Services officials) (citing *Harris,* 127 F.3d at 999 & n. 7).

Thus, this Court, following the majority of courts, employs the term, "governmental unit," to describe Defendant, a public trust of Dade County, Florida operating a public sector health care provider.[12] *See also Howell,* 922 F.2d at 723–24 (suggesting Correctional Medical Systems ("CMS"), a medical services provider, could be sued under § 1983 were its employee the final decision-maker); *Frances–Colon v. Ramirez,* 107 F.3d 62, 63 (1st Cir.1997) (explaining when substantive due process interest can support personal injury claim under § 1983 against health care provider). In *Howell,* the Eleventh Circuit held that CMS, a private provider under contract with the state, "can be a person acting under the color of state law for the purposes of section 1983." *Howell,* 922 F.2d at 724. On the facts of the case, however, the *Howell* court ruled that CMS could not be sued because its employee, Dr. Robinson, did not have final authority on matters of equipment and staff procurement at the State correctional and medical institution, where the plaintiff's husband had died as an inmate. *See id.* at 725.

In *Frances–Colon,* parents brought a malpractice action on behalf of their minor son, Eric, against a municipal hospital, among others. *See Frances–Colon,* 107 F.3d at 62. The parents attempted to use § 1983 to sue the hospital for its doctors' alleged mishandling of Eric's delivery in violation of his substantive due process rights. *Id.* at 62–63. The First Circuit held that a substantive due process interest in "bodily integrity" or "adequate medical care" can support a personal injury claim under § 1983 "against the provider of a governmental service." *Id.* at 63.

Finally, to obtain relief under § 1983, Plaintiff must show he was deprived of a federal right by a person acting under state law and must therefore establish "state action." *Patrick v. Floyd Medical Center,* 201 F.3d 1313, 1315 (11th Cir. 2000). The Supreme Court recently held

---

**12.** That Defendant is not a "state grantee" (Reply at 2–3) does not remove it from the ambit of § 1983 either. Defendant has defined "state grantee" as a "governmental unit that received funds directly from the federal government." (*Id.* at 2.) The third prong, however, does not require the statute in question to impose a binding obligation on a "state grantee," but rather on a "governmental unit." *Wilder,* 496 U.S. at 508–09, 110 S.Ct. 2510 ("governmental unit"). Defendant based its "state grantee" argument on two cases, in which state actors receiving direct federal grants were sued under § 1983. *See, e.g., Thiboutot,* 448 U.S. at 1, 100 S.Ct. 2502 (reviewing AFDC beneficiary's claim against State of Maine for welfare benefits under § 1983); *Wright,* 479 U.S. at 418, 107 S.Ct. 766 (reviewing tenant's suit against local "public housing authority" directly overseen by HUD). However, neither *Thiboutot, Wright,* nor any other court reviewing § 1983 enforcement of a federal right has employed Defendant's turn of phrase, "state grantee" when discussing the third-prong of the *Wilder* test. Furthermore, by suggesting that private providers could be sued under § 1983 in *Howell v. Evans,* 922 F.2d 712, 724 (11th Cir.), *vacated pursuant to settlement,* 931 F.2d 711 (11th Cir.1991), the Eleventh Circuit has agreed that § 1983 defendants need not be "state grantees." Therefore, whether Defendant is a "state grantee" is of no consequence here.

state action requires both an alleged constitutional deprivation "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," *and* that "the party charged with the deprivation must be a person who may fairly be said to be a state actor."

*American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (citations omitted, emphasis in original).

A "governmental unit," Defendant is "an agency and instrumentality of the state." (Am. Class Action Compl. ¶ 3.) As such, Defendant, a public health trust, is a state actor, and state action is easily established.

In sum, § 1396a(a)(25)(C) obligates Defendant, a governmental unit, not to collect from Plaintiff payments exceeding its Medicaid disbursement. *See Public Health Trust,* 693 So.2d at 565 (invalidating State Medicaid regulations authorizing county trust to use its hospital claim of lien to collect from Medicaid recipient's tort recovery);[13] Michael K. Beard, *The Impact of Changes in Health Care Provider Reimbursement Systems on the Recovery of Damages for Medical Expenses in Personal Injury Suits,* 21 Am. J. Trial Advoc. 453, 470 n. 98 (1998) (noting that "all courts" considering "whether a physician accepting a Medicaid payment could seek to recover additional sums after the patient had received a settlement of a personal injury lawsuit ... have denied such recovery"). Therefore, once Defendant has breached this obligation to Plaintiff, he may invoke § 1983 to enforce his right as a Medicaid patient, under § 1396a(a)(25)(C), to sue Defendant for the return of unlawfully collected monies.

**13.** According to 42 U.S.C. § 1988a, the "federal courts' jurisdiction to decide a section 1983 suit will be governed by applicable state law when there is no controlling federal law on a particular point." *Hopkins v. Oklahoma Public Employees Retirement Sys.,* 150 F.3d

## III. Conclusion

Plaintiff has successfully met the three requirements of the *Wilder* test to show that § 1396a(a)(25)(C) creates a privately enforceable right for purposes of filing a § 1983 action. As such, this Court has federal question jurisdiction to hear Plaintiff's stated § 1983 claim that Defendant, a municipal health care provider, has violated the federal rights of Plaintiff, a Medicaid patient, under § 1396a(a)(25)(C) of the Medicaid Statute by asserting and accepting collection on Plaintiff's lien in excess of the Medicaid reimbursement.

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendant's Motion to Dismiss (D.E.12) is **DENIED**.

2. Plaintiff's Motion for Hearing on the Motion to Dismiss (D.E.17) is **DENIED** as moot.

3. Defendant's Motion to Stay Discovery and Class Certification Pending Disposition of Defendant's Motion to Dismiss Plaintiff's Amended Class Action Complaint (D.E.23) is **GRANTED**. Defendant's Motion to Stay Response to Class Certification Motion (D.E.40) is **GRANTED**.

4. Pursuant to the Court's Order, issued December 3, 1999, the parties shall submit a joint scheduling report within 20 days from the date of this Order.

5. Defendant shall have 20 days from the date of this Order within which to respond to Plaintiff's Motion to Certify Class (D.E.37), filed September 7, 1999.

1155, 1159 (10th Cir.1998) (citing *Robertson v. Wegmann,* 436 U.S. 584, 588–90, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978)).